[No. 3928.]

## GROGAN v. TRAVELERS' INSURANCE COMPANY.

1. CONTRACT—*Elements.* To a valid contract mutual assent is necessary.

2. INSURANCE—*Renewal by Agent Not Accepted by Assured.* As the expiration of a life policy approached, the local agent of the insurer not being able to communicate with the assured, forwarded to the insurer company, from her own funds, the premium required for the renewal of the policy, and transmitted to the assured the renewal

receipt. The assured, later, being informed by the agent of the advance which she had made, wrote expressing his regret at the course taken, declaring that he had not intended to renew, declining to repay the advance, and promising to return the renewal receipt, on his return from a journey upon which he was then absent from home. During this journey he came to his death. The insurer company being informed of the facts, cancelled the policy. *Held* there was no meeting of minds upon the proposed renewal of the policy and that the beneficiary therein was not entitled to an action.

*Error to the Denver District Court.* HON. GREELEY W. WHITFORD, Judge.

Messrs. TONEY & TONEY, Mr. GEORGE S. REDD, and Mr. BERT MARTIN for plaintiff in error.

Messrs. GOUDY & TWITCHELL and Mr. J. H. BURKHARDT for defendant in error.

BELL, J.

In September, 1907, The Travelers' Insurance Company of Hartford, Connecticut, issued to William Grogan, the assured, an accident insurance policy in the sum of $3,000.00, payable to Alice S. Grogan, plaintiff in error, beneficiary named therein, for an annual premium rate of $25.50. The policy, by its terms, expired at noon of September 6, 1908, and provided for the payment of certain accumulating benefits and double indemnity in specified cases, and, upon its expiration September 6, 1908, it was renewed for another year ending September 6, 1909. The assured was engaged as state foreman of The Colorado Telephone Company during the existence of the policy, and, much of the time, was away from his home and office. Before the expiration of the renewed term of the policy, Ella J. Colburn, acting as soliciting agent of the insurance company, called at the assured's office from time to time for the purpose of delivering to him, if he would accept, a renewal receipt which would continue the

policy in force for another year ending September 6, 1910. She was unable to find him at the office, however, and, about a week before the first renewed term had expired, she enclosed, in a letter addressed and mailed to the assured, the renewal receipt for the year ending September 6, 1910, which was furnished her by the insurance company, duly signed and attested. By custom or arrangement with the company, the agent was allowed sixty days from the expiration of the policy, or last renewal, to make remittances for the succeeding renewal, or return the renewal receipts, and, not having seen or heard from the assured during this period, in her endeavor to continue the policy in force for another year, the agent advanced the amount of the premium to the company on November 9, 1909, and, on the same day, addressed and mailed a letter to the assured informing him of the fact and requesting that he mail a check to her in settlement thereof. The assured seems to have been out on the road, and wrote his reply on the letter he received, informing her that he had been out of the city almost continually of late, and, therefore, he could not attend to the matter; but that, "if you have advanced the amount of the premium," he was very sorry, as he had about decided to discontinue the policy. Through adopting the subjunctive form of speech, the assured implied a doubt as to the actual payment of the premium; nevertheless, he did not positively repudiate her alleged unauthorized conduct, neither did he express his approbation of her alleged voluntary services in his behalf. On November 26, 1909, she again wrote the assured, informing him that the policy was in full effect, and protection to him was continued, and would be as long as he held the receipt; and, continuing, further informed him as follows:

"As I had not heard from you to the contrary, although I had written you and had tried several times to see you, I thought, of course, that you wished the protec-

tion continued, as you had carried it for several years. I, therefore, advanced the premium out of my own personal funds. I do not want to urge you to keep this insurance if you do not feel that you want it, so if you decide that you do not wish the protection continued, kindly return me Renewal Receipt No. 1117347, and mail me your check for $6.40, amount due on your policy since September 6th, date of expiration of your last premium payment. I will then return the receipt to the company and will cancel the policy on December 6th and amount of unearned premium will then be returned to me. If you do not return the receipt, I will consider that you wish the protection continued and will then be looking for your check for $25.50, the full year's premium. I trust that the latter will be the case and that I may be favored with the continuance of your patronage.

"I learned from your office this morning that you had left on another trip, but that they expected you to return next Tuesday, the 30th. I trust that you will give this matter your attention immediately upon your return."

On December 9, 1909, he replied to the letter above quoted, as follows:

"I did not have time to answer your letter while I was in Denver. I am truly sorry I have been of so much trouble to you. I will return the renewal receipt No. 1117347 just as soon as I return to Denver, which will be about December 18th or 19th. I am very sorry you advanced the amount of the policy, as I did not intend to renew it this year, therefore I am not sending the $6.40 which you say is due for three months. I cannot see where I can be held for this amount, and sincerely hope the company will not hold you for it."

Whatever may be said of what had passed between the parties previously, there seems to be no question but the contents of the letter last above quoted operated as a

polite and unmistakable repudiation of all of the voluntary acts of the soliciting agent in her endeavor to continue the life of the policy, and positively notified her that he did not intend to renew the policy in whole or part. The evidence clearly establishes that the soliciting agent voluntarily paid the renewal premium of $25.50 necessary to continue the policy in force to September 6, 1910, under the misapprehension that the assured desired the continued protection and, on demand, would repay her for the advance so made; and she, in effect, so wrote him. However, instead of desiring or intending to renew the policy, he notified her to the contrary; and, when notified that the premium had been advanced to the company, instead of remitting the amount thereof, he politely informed her that he could not be held for its payment in whole or part, and promised to return the renewal receipt upon his arrival in Denver. There were no further transactions or correspondence between the assured and the agent, and, on December 18th, 1909, he was killed in a railroad wreck near Crested Buttes, about three or four hundred miles from his home. The superintendent of construction of the telephone company informed the agent of the death of the assured, and inquired as to the condition of his insurance. She frankly told him how the matter stood, and he assured her that the relatives of the assured would reimburse her for the amount of the premium advanced. She thought, however, and he agreed, that it was her duty to submit the correspondence between her and the assured to her superior officers, which was accordingly done, and thus, for the first time, they were made acquainted with the facts in the case. They returned to the agent the amount of the premium advanced by her, and cancelled the policy, as it was a practice of the company to refund the premium in a disputed case, where it was manifest that no contract existed between it and the assured.

It is clear that there was no meeting of the minds of the company, or any of its agents, with that of the assured in the same sense, or at all, at any time, for a renewal of the policy beyond September 6, 1909, hence there was, and could be, no contract existing between him and the company, or any of its agents, for a renewal or extension of the policy beyond said date. Under the circumstances presented in the record, we know no legal principle that would bind the assured for the payment of the premium and the acceptance of a renewal of the policy, which he never desired, intended to accept, or authorized anyone to procure for him; and, if he had lived, and could not have been required to pay the premium advanced by the soliciting agent, or if, instead of death, he had suffered a mere disability covered by the policy, and could not have recovered therefor, then it is difficult to see upon what ground his beneficiary can recover, after his death, upon a repudiated policy, for which he paid nothing, and positively refused to pay for or accept. If we assume that assured received the letters of the soliciting agent and the renewal receipt in due course of mail, and held them in silence until after he was notified that the agent of the company had advanced the premium, and attempted to renew the policy, his mere possession of the renewal receipt and proposition for renewal would not imply an assent to accept the same, but, rather, would be taken as a declination thereof. —*Ins. Co. v. Johnson,* 23 Pa., 72, 75; *Brink v. Merchants', Etc., Co.,* 17 S. D., 235, 237, 95 N. W., 929; *Busher v. N. Y. L. Ins. Co.,* 72 N. H., 551, 58 Atl., 41; *Whiting v. Mass. Ins. Co.,* 129 Mass., 240, 37 Am. Rep., 317; *Van Wert v. St. Paul F. & M. Ins. Co.,* 90 Hun, 465, 36 N. Y. Supp., 54; *N. Y. L. Ins. Co. v. Manning,* 156 App. Div., 818, 124 N. Y. Supp., 776, 142 N. Y. Supp., 1132.

If insurance agents entertain the mistaken view that a policy is in force while the written proposition therefor

is in the possession of the assured named in the policy, without his assent to the essential elements of the contract, this would not change the rule of law that there cannot be a legal contract without the mutual assent of the parties thereto.—*Richmond v. Travelers' Ins. Co.*, 123 Tenn., 307, 130 S. W., 790, 30 L. R. A. (N. S.), 954.

The payment of the premium in this case, made by the agent, through the mistaken apprehension that the assured desired a renewal of his policy, and that he would, upon being notified, reimburse her therefor, bears no kind of analogy to a case in which a contract exists, and a person especially interested in the assured or the beneficiary advances the premium as a gratuity, or on the assumption that the amount so advanced will be refunded by the interested parties. Whatever the intentions of the soliciting agent in the instant case may have been, the effect of her conduct was to attempt to pay the assured into a policy against his wishes, and in which she had no interest, except in the receipt of such resulting premiums as might come to her and the company, and on her alleged assumption that the assured desired to continue the protection.

The trial court met the witnesses face to face, weighed the evidence, and reached the conclusion that there was no liability on the alleged renewal contract, and we think that this conclusion is fully supported by the record; therefore, the judgment should be, and is hereby, affirmed.

*Affirmed.*

MORGAN, Judge, dissenting:

Action by the beneficiary on a policy for one year containing the following provision: "but it may be renewed subject to all provisions of the policy from term to term thereafter by the payment of the premium in advance." It had been renewed twice prior to this in-

stance by delivering a renewal receipt, the same as the following, delivered in this instance: "Received of William Grogan premium of Twenty-five and 50-100 Dollars continuing in force Policy C 121417 from the 6th day of September, 1909, to the 6th day of September, 1910, at noon, subject to all the conditions in original policy." The majority opinion discloses that the advance payment was waived in this instance, as it had been before. The minds of the parties had met on all the terms of the policy sued upon, including the manner of its renewal, when the policy was issued. It is especially true, in the issuance and extension of insurance policies, that the receipt and retention of the same, without rejection, in apt time, implies acceptance, and the risk attaches. The application for the extension in this instance was contracted for and implied, in the original policy. When, by previous negotiations, or arrangement, the minds of the parties have met on a unilateral agreement and the same is delivered in a complete form, as in this instance, the acceptance of it is implied, unless it be rejected within a reasonable time. The only case cited in the majority opinion, that appears to be contrary to this view, is that of *Richmond v. The Travelers' Ins. Co.*, 123 Tenn., 307, 130 S. W., 790, 30 L. R. A. (N. S.), 954. In that case it is apparently conceded that, if there had been an application for the extension, the acceptance of the latter would have been implied by retaining the same, without objection; and, in that case, it must be noticed that the insured rejected the renewal and returned it within fifteen days after it was received, thus ending the matter.

The understanding between the insurer and its agent concerning the payment, by her to it, of the premium within the sixty days, and such payment by her, was intended to have the effect it actually did have, to extend the time for the insured to pay, and to avoid calling in

the renewal receipt and annulling or cancelling the policy. —2 May on Insurance, page 786.

The vague and indefinite language of the insured in his two letters indicated that he considered the policy in force, wherein he says in the first letter that he had about made up his mind to discontinue it. The agent so construed both letters, as shown by her letter asking payment for the time the policy had been in force. However, his announcement, November 26, in answer to the agent's letter demanding payment for the time the policy had been in force, of what his intention had been, or was then, could not annul the policy without the consent of the beneficiary and the insurer, after it had become effective by his implied acceptance and the absence of rejection, even though it estopped him from thereafter taking a contrary position; his conduct in keeping the renewal for so long, and his silence on receipt of the three separate requests to pay for it, including the information that the policy was in full force and effect, so long as he retained the receipt, gave the insurer to understand that he considered the contract complete, and the insurer so understood it, as shown by the agent's letters to the insured; and by the sixty days' arrangement and payment by the agent; therefore, the beneficiary had a vested interest in the policy which she could enforce, because the insurer left the policy in force and did not cancel it until after the death of the insured.

If a deed, bill of sale, lease, or extension of lease, insurance policy, or the extension of it, be executed and delivered according to previous negotiation, or arrangement, whereby the minds of the parties met, no overt act to show active acceptance is necessary to make a binding contract; the minds of the parties have met upon every conceivable feature, if there is any new feature introduced not arranged for, or if the delivery is upon a condition of advance payment, such condition may be waived,

as was done in this instance, or the instrument may be rejected, but the rejection must be timely.

According to the majority opinion, the insured could say at the end of the year, if the insurer chose to wait so long for payment, that he never intended to renew, and thus obtain his insurance free, at his option, if no loss occurred; the insurer could give him the entire year, and could accept payment at any time, if no loss occurred, but refuse in case of loss, by saying their minds had never met, if it could prove the secret thought of the insured. If the insured had returned to Denver without injury and had paid the premium, either for the year or up to that date, he would have paid for two and one-half or three months' insurance he never had, according to the majority opinion. The ample provisions of the law do not permit such uncertainty in contracts whereby both parties may suffer.

With due respect for the contrary view of my associates, it is my opinion that, when this unilateral receipt was *unconditionally delivered* to the insured and he kept it *without rejection,* for over two months and a half, the risk attached, and nothing said or done after that, except a cancellation of the policy, could divest the right of the beneficiary.—2 May on Ins., secs. 399 M., 399 P., 400. This insurance contract involved three parties. It was made payable to the beneficiary in case of death of the insured and her interest attached, when the contract was made, and continued, when it was extended. The original policy, containing a clause for a renewal from year to year, together with complete acquiescence in, and the meeting of minds upon, the terms of the policy, constituted a prearrangement for the delivery of the renewal receipt, unconditionally, without the formality of an application, and for immediate attachment of the risk, if the insurer chose to waive the advance payment of the premium, subject, only, to the right of the insured to

reject the renewal, and the consequent right of the insurer to cancel the risk; and if it chose to leave it uncanceled until the death, the beneficiary could recover.— *Adams v. Eidam,* 42 Minn., 53, 43 N. W., 690; *Travelers' Ins. Co. v. Jones,* 32 Tex. Civ. App., 146, 73 S. W., 978; *Waters v. Security L. & A. Co.,* 144 N. C., 663, 57 S. E., 437, 13 L. R. A. (N. S.), 805.

Decided February 11, A. D. 1914. Rehearing denied, April 13, A. D. 1914.